**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.H., individually and on behalf of N.H., a student with a disability,<br><br>Plaintiffs,<br><br>-against-<br><br>The Board of Education of the City School District of the City of New York, the New York City Department of Education, a/k/a New York City Public Schools, the City of New York, and Chancellor Kamar H. Samuels, in his official capacity,<br><br>Defendants. | 26 Civ. 5926 (____)<br><br>ECF CASE |

**DECLARATION OF A.H. IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

A.H. declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

**I. Introduction**

1. I am the mother of N.H., the student who is the subject of IHO Case No. 307092, and a Plaintiff in this action. I am over the age of eighteen and am competent to declare, attest, and affirm under penalty of perjury as stated above, to the matters set forth below.

2. I submit this Declaration in support of Plaintiffs' motion for a temporary restraining order and preliminary injunction directing Defendants to fund and implement N.H.'s pendency placement, referred to herein as "the 2019 Program."

3. The statements in this Declaration are based on my personal knowledge, on records I keep in the ordinary course of managing N.H.'s special education program, and on the documents annexed as exhibits to the accompanying Declaration of Laura D. Barbieri, Esq., dated July 13,

2026 (the "Barbieri Decl."). Where I state something on information and belief, I believe that statement to be true.

4. I am the parent with primary responsibility for arranging, monitoring, and advocating for N.H.'s special education program and services. I am personally familiar with each of the evaluators, providers, school officials, due process complaints, hearing officers, and orders described below, and with my son's day-to-day functioning, behavior, and educational needs.

**II. N.H.'s Classification and Needs**

5. N.H. is fifteen years old. He resides with me, his father, and his siblings in Brooklyn, New York, and has at all relevant times remained a New York City resident.

6. N.H. has been classified by the DOE's Committee on Special Education ("CSE") as a student with autism. His eligibility for special education has never been in dispute. He has been diagnosed by clinicians with Autism Spectrum Disorder, Sensory Processing Disorder, and Attention-Deficit/Hyperactivity Disorder.

7. N.H. requires a twelve-month program to prevent regression and to make meaningful educational progress. He requires intensive 1:1 special education instruction ("SEIT services") throughout the day, in addition to enhanced occupational therapy incorporating Astronaut Training and a Therapeutic Listening protocol, regular individual occupational therapy, individual physical therapy, individual speech-language therapy, parent counseling and training, and behavior analyst supervision. These needs have been identified, and the program necessary to address them prescribed, by multiple independent evaluators and by a final, unappealed Findings of Fact and Decision ("the 2019 FOFD").

**III. The 2019 FOFD Establishes N.H.'s Pendency Program**

8. N.H.'s pendency program is established by an unappealed Findings of Fact and Decision dated November 9, 2019 in IHO Case No. 174703 (the "2019 FOFD"), issued by Impartial Hearing Officer Suzanne M. Carter. A true and correct copy of the 2019 FOFD is annexed to Barbieri Decl. as Ex. 2.

9. In the 2019 FOFD, IHO Carter made substantive findings on the merits, including that the DOE failed to offer N.H. a free appropriate public education and that the equities favored the parent. Based on those findings, IHO Carter ordered that N.H. was entitled to the full program of services set forth in that decision.

10. The full program of services set forth in the 2019 FOFD ordered the following twelve-month program of services (the "2019 Program"):

a. forty (40) hours per week of 1:1 Special Education Itinerant Teacher ("SEIT") services;

b. seven (7) hours per week of enhanced Occupational Therapy ("OT") incorporating Astronaut Training and Therapeutic Listening;

c. individual OT three (3) times per week for forty-five (45) minutes per session;

d. individual Physical Therapy ("PT") three (3) times per week for forty-five (45) minutes per session;

e. individual Speech-Language Therapy ("SLT") four (4) times per week for thirty (30) minutes per session;

f. two (2) hours per week of Parent Counseling and Training ("PCAT"); and

g. two (2) hours per week of Board-Certified Behavior Analyst ("BCBA") supervision.

11. The 2019 FOFD further ordered that providers be paid at prevailing rates.

12. The DOE did not appeal the 2019 FOFD. It is my understanding that it therefore is final and binding on the parties.

**IV. The 2019 Program Has Been Repeatedly Reaffirmed as N.H.'s Pendency Placement**

13. The 2019 Program has been the basis for pendency in every due process proceeding I have filed since 2019. Pendency Orders confirming N.H.'s entitlement to the full 2019 Program were issued on December 19, 2022 in IHO Case No. 226491, on July 23, 2025 in IHO Case No. 293773, and on December 23, 2025 in IHO Case No. 303474. The full 2019 Program was further affirmed by State Review Officers in Appeal No. 24-628 (April 28, 2025) and Appeal No. 24-636 (August 8, 2025). True and correct copies of the Pendency Orders are annexed to Barbieri Decl. as Exs. 3, 4, and 5.

14. The December 23, 2025 Order on Pendency, issued by IHO Melvin Dalere in IHO Case No. 303474, a due process complaint I filed through counsel on October 27, 2025, directed the DOE to fund the 2019 Program for the period from October 27, 2025 through December 31, 2025. The DOE funded the services under that order through December 31, 2025.

15. The last program the CSE developed for N.H. was an Individualized Education Services Program ("IESP") dated March 28, 2023. Despite our repeated requests for a CSE meeting, the CSE has not been convened since. That document (*i.e.*, the IESP) did not replace the 2019 FOFD as N.H.'s pendency placement. The DOE apparently agreed since it continued to fund the 2019 Program as pendency after it was developed.

16. The DOE has never challenged the 2019 Program as the basis for N.H.'s pendency in any of these proceedings.

**V. The DOE's Discharge of N.H. and Refusal to Convene the CSE**

17. As of July 1, 2025, the start of the twelve-month 2025-2026 school year, the CSE has not developed an Individualized Education Program for N.H., and has not convened to develop educational recommendations for him since approximately March 2023.

18. On or about August 15, 2025, I submitted a written request for an IEP meeting to the CSE for the 2025-2026 school year. I submitted a follow-up request on or about September 9, 2025. True and correct copies of those requests are annexed to Barbieri Decl. as Ex. 6.

19. On September 8, 2025, the DOE issued a Letter of Discharge asserting that N.H. had transferred to a school outside of New York City, while simultaneously stating that he remains a New York City resident. N.H. attends a nonpublic school located outside of New York City, and remains entitled to receive his special education services through CSE 6; his attendance in a nonpublic school outside New York City has never altered his New York City residence. I did not consent to any discharge. No CSE meeting was convened. I received no prior written notice. A true and correct copy of the DOE's discharge notice is annexed to Barbieri Decl. as Ex. 7.

20. On September 15, 2025, through counsel, I served a Ten-Day Notice on the DOE advising that, in the absence of a DOE-funded program, I would retain providers to deliver the services required by the 2019 FOFD and would seek public funding through a due process administrative proceeding. The notice expressly stated that nothing in it should be deemed to relieve the DOE of its obligation to provide pendency services. A true and correct copy of the Ten-Day Notice is annexed to Barbieri Decl. as Ex. 8.

21. The DOE did not respond with an alternative pendency placement, did not identify providers who could implement the 2019 Program, and did not offer any equivalent program capable of beginning without interruption. Its unilateral discharge left N.H. with no IEP, no

program, no services, and no pathway to obtain any of these through the DOE for the 2025-2026 school year.

**VI. During Case No. 307092, the DOE's Own Authorizations Recognized the 2019 Program**

22. On December 31, 2025, through counsel, I filed the operative due process complaint in IHO Case No. 307092, which also was assigned to IHO Dalere. I later amended that due process complaint on February 9, 2026, again alleging the DOE's failure to offer any program or placement and seeking to maintain the 2019 Program pursuant to pendency. I requested an interim pendency order based on the unappealed 2019 FOFD. The DOE did not propose an alternative pendency program.

23. During the 2025-2026 school year, the DOE's Impartial Hearing Order Implementation Unit issued explicit authorizations to several of the very providers from whom N.H. had received services pursuant to the 2019 FOFD.

a. On January 23, 2026, in IHO Case No. 303474, the DOE issued a direct authorization to Dvorah Levin, N.H.'s SEIT provider, authorizing DOE-funded SEIT services at a rate of $225 per hour for forty hours per week on a twelve-month basis, retroactive to October 27, 2025 and terminating December 31, 2025. A true and correct copy of the authorization is annexed to Barbieri Decl. as Ex. 9.

b. On March 19, 2026, in IHO Case No. 303474, the DOE issued a direct authorization to Victoria Kravets, N.H.'s individual OT provider, authorizing DOE-funded individual OT at three forty-five-minute sessions per week on a twelve-month basis, retroactive to October 27, 2025 and terminating December 31, 2025. A true and correct copy of the authorization is annexed to Barbieri Decl. as Ex. 10.

24. Each of the above-described authorizations identifies N.H. by name and identifies the December 23, 2025 Pendency Order by IHO Case No. 303474; each confirms that the underlying services are required on a twelve-month basis pursuant to that Pendency Order; and each confirms that pendency is effective from October 27, 2025 until the conclusion of the case.

25. The providers identified in those authorizations are the same providers from whom N.H. was receiving services when the due process complaint in IHO Case No. 307092 was filed on December 31, 2025, and were the same providers at the time of the May 12, 2026 hearing. I did not create a new program. I attempted to preserve the same 2019 Program that the DOE had previously funded with the same providers that the DOE's own Implementation Unit continued to recognize as part of the pendency program.

**VII. The DOE's Failure to Authorize N.H.'s Physical Therapy Provider**

26. The DOE states that it issued a Related Service Authorization ("RSA") for N.H.'s individual physical therapy services on or about November 5, 2025. As I understand it, an RSA permits a parent to obtain a private provider at a DOE-set rate. It is the DOE's acknowledgment that the service is required by pendency and that the DOE itself was unable to assign a public provider to deliver it.

27. N.H.'s longstanding PT provider, Mirel Freidman, does not accept the DOE's RSA pendency rate and has never accepted that rate during the years she has provided services to N.H. In every prior pendency cycle in which Ms. Freidman was our chosen provider, the DOE authorized her directly at the prevailing pendency rate that is consistent with the rate she has consistently charged.

28. My counsel's office and I repeatedly wrote to the DOE Implementation Unit, including to LaShaundra Polk and Katrina Wilkins, requesting that the PT authorization be

corrected to a direct authorization for Ms. Freidman at the pendency rate she has historically received. The DOE never corrected the PT authorization. Correspondence reflecting the DOE's issuance of the PT RSA, my requests for correction, and the DOE's non-response is annexed to Barbieri Decl. as Ex. 11.

29. The DOE offered no alternative provider when it issued or claimed to issue the RSA, and gave me no information about available providers willing to accept it and able to begin immediately.

**VIII. Expiration of the December 23, 2025 Pendency Order and the Resulting Loss of Services**

30. The December 23, 2025 Pendency Order expired by its terms on December 31, 2025. From January 1, 2026 forward, no interim pendency order has been in place for N.H.

31. The absence of an interim pendency order has had immediate and adverse consequences for service delivery and has been irreparably harmful to N.H. For example, N.H.'s individual speech-language therapy provider, Danielle Green, was unable to continue providing SLT without a pendency order in place to fund those services at the pendency rate. As a result, N.H. has received no speech-language therapy to date, even though SLT is a component of the 2019 Program.

32. Since the DOE's funding lapsed on December 31, 2025, N.H. has also been without 1:1 special education itinerant teacher services, enhanced occupational therapy incorporating Astronaut Training and Therapeutic Listening, parent counseling and training, BCBA supervision, and individual OT and PT. The DOE has not funded any of the 2019 Program components, and it has not arranged for any provider to deliver them.

**IX. The May 28, 2026 Order on Pendency**

33. At the May 12, 2026 pendency hearing, the DOE did not dispute that the 2019 FOFD was the appropriate basis for pendency. The May 28, 2026 Order on Pendency so found.

34. Despite that finding, the IHO denied pendency by Order dated May 28, 2026, on the theory that my retention of private providers to deliver the 2019 Program constituted a rejection of pendency by self-help. A true and correct copy of that Order is annexed to Barbieri Decl. as Ex. 12.

35. I did not reject pendency, and I did not change N.H.'s program. I retained the same providers, delivering the same services, at the same frequencies prescribed by the 2019 FOFD, because the DOE stopped funding them and offered nothing in their place. Had I done nothing, N.H. would have received no services at all.

36. Both the DOE and I appealed the May 28, 2026 Order to the State Review Officer. As of the date of this Declaration, no SRO decision reversing or enforcing pendency has been issued.

37. On June 15, 2026, IHO Dalere issued a Findings of Fact and Decision on the merits in IHO Case No. 307092, finding that the DOE denied N.H. a free appropriate public education for the 2025-2026 school year by failing to develop any IEP or IESP and by failing to offer any educational program or placement. A true and correct copy of that decision is annexed to Barbieri Decl. as Ex. 13. That merits decision is the subject of a separate administrative appeal and does not diminish N.H.'s independent and immediate entitlement to his pendency placement.

**X. Harm to N.H.**

38. The 2019 Program is not a generic schedule of related services. It is the specific, integrated twelve-month program of intensive supports that the 2019 FOFD determined N.H.

requires to make meaningful educational progress and to avoid regression. Each component addresses a specific cluster of N.H.'s deficits, and the program functions as a unified whole.

39. For example, the termination of N.H.'s SEIT services inflicts harm that cannot be undone through later compensatory relief. SEIT services provide N.H. with individualized, specially designed instruction, delivered by a certified special education teacher within [his/her] natural learning environment, targeting the specific deficits identified in his IEP — [communication, social-emotional regulation, pre-academic readiness, and adaptive functioning]. These services are not generalized enrichment that can be paused and resumed without consequence; they are the mechanism by which N.H. acquires and consolidates foundational developmental skills. Children with disabilities characteristically regress quickly when specialized instruction is interrupted and recoup lost skills slowly, if at all. Each day without services widens the gap between N.H. and his expected developmental trajectory and erodes progress that took months of consistent intervention to achieve. The loss also severs the continuity and predictability on which N.H. depends to stay regulated, engaged, and available for learning, so that the deprivation is not merely a suspension of hours but a setback that compounds over time. Because the developmental period at issue cannot be relived, and the skills lost during it cannot be reliably restored after the fact, the harm to N.H. is immediate, ongoing, and irreparable.

40. The loss of 1:1 enhanced OT incorporating Astronaut Training and Therapeutic Listening has caused N.H.'s sensory processing challenges to go unaddressed. Without these specialized protocols, his hypersensitivity to tactile, auditory, and visual stimuli is not regulated, his sensory diet is not implemented, and the result is the emergence of maladaptive behaviors that interfere with his learning and his ability to function appropriately in educational and home settings. This loss also undermines the efficacy of his 1:1 SEIT instruction.

41. The termination of N.H.'s occupational therapy compounds the harm and independently threatens irreparable injury. OT provides N.H. with specially designed intervention targeting the [fine-motor, visual-motor, sensory-processing, and self-regulation] deficits identified in his IEP — the underlying skills that allow [him/her] to grasp and manipulate objects, develop the precursors to writing and other pre-academic tasks, tolerate and organize sensory input, and manage the self-help and daily-living routines expected in a classroom setting. These are not peripheral supports; occupational therapy is frequently the gateway service that makes all other instruction accessible, because a child who cannot regulate his sensory system or perform basic motor tasks cannot remain calm, attend, or participate in the classroom long enough to benefit from teaching. Interrupting these services during early childhood — when sensory and motor foundations are still being laid and are most responsive to intervention — produces regression that is disproportionate to the length of the gap and slow to recoup, and it stalls the acquisition of adaptive independence that N.H.'s continued development depends upon. Each week without OT not only erodes gains that took sustained, hands-on intervention to build, but also degrades N.H.'s ability to access his remaining services and educational program as a whole. Because the developmental window for establishing these foundational skills cannot be recreated after the fact, the harm from the loss of OT is immediate, cumulative, and irreparable.

42. The loss of 1:1 speech-language therapy has caused N.H.'s expressive, receptive, and pragmatic language deficits, as well as his social communication challenges, to go unaddressed. Without consistent intervention, his ability to communicate his needs, to participate in age-appropriate social interactions, and to engage with the verbal demands of his educational program deteriorates.

43. The loss of parent counseling and training has deprived our family of the structured guidance that the IHO determined we require in order to implement N.H.'s program at home consistently, particularly in the areas of behavior management, sensory regulation, and transitions between home and school.

44. The loss of BCBA supervision has left N.H.'s program without the specialized behavior-analytic oversight needed to ensure that interventions are evidence-based, are implemented with fidelity, and are adjusted in response to data.

45. The failure to authorize N.H.'s physical therapy provider at the pendency rate has placed his gross motor, motor planning, and balance services at risk, and has left services rendered by that provider unpaid.

46. The cumulative effect is that N.H. has been deprived, on a continuous and ongoing basis, of the integrated twelve-month educational and therapeutic program prescribed for him. That deprivation is causing educational regression, loss of educational opportunity, behavioral and sensory dysregulation, and delay in the development of the very skills the 2019 Program was designed to build. Each additional week without these services compounds the harm, and it cannot be undone or repaired by a later award of money.

47. To the extent any component of the 2019 Program has gone undelivered or unbilled during the 2025-2026 school year, the cause is the DOE's failure to authorize at the pendency rates N.H.'s providers have historically received, and the absence of any interim pendency order from January 1, 2026 forward. It is not the result of any unilateral action by me.

**XI. Make-Up Pendency Services**

48. The period during which the 2019 Program should have been funded and implemented runs from December 31, 2025, the filing date of IHO Case No. 307092, through the

date of this Declaration, a period of approximately twenty-seven (27) weeks. That period continues to grow each week.

49. Because the DOE issued direct authorizations for SEIT services (Dvorah Levin) and individual OT services (Victoria Kravets), each retroactive to October 27, 2025; however these services ended by their terms on December 31, 2026. I seek direct funding and payment of the outstanding invoices for them, and I seek make up services for the loss of N.H.'s 2019 Program from January 1, 2026 to the present.

50. Similarly, I seek make up services for each missing component N.H.'s 2019 Program that has gone undelivered to date.

51. These number of hours of make-up services continue to accrue for each additional week that the DOE fails to fund and implement the 2019 Program, and should be calculated through the date of the Court's decision rather than the date of this Declaration.

52. I request that any make-up services be funded at the enhanced or private provider rates, so that I may retain the qualified specialists needed to deliver the prescribed services with the intensity and individualization that the 2019 FOFD requires.

**XII. Relief Requested**

53. I respectfully request that the Court direct Defendants, within five business days, to fund and/or make immediately available qualified providers for each component of the 2019 Program on a twelve-month basis, retroactive to December 31, 2025 and prospectively while the administrative and judicial review proceedings remain pending.

54. I further request that Defendants be directed to pay all outstanding invoices for pendency services already delivered to N.H., to reimburse me for the cost of services I have been

required to secure, and to fund and provide make-up pendency services for each of the 2019 Program components the DOE failed to provide to the date of the Court's decision.

55. To the extent the DOE contends that it may implement pendency through providers other than N.H.'s existing providers, I request that it be required to identify qualified providers able to begin immediately and to ensure no interruption in services. Until it does so, I request that it be required to fund the existing providers whose services are or would be preserving the 2019 Program.

56. I respectfully request that the Court grant the relief sought in Plaintiffs' motion, together with such other and further relief as the Court deems just and proper.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: July 14, 2026
New York, New York

Alexandria Hertz
A.H.
*Plaintiff*